# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Orbisonia-Rockhill Joint Municipal Authority | : | CASES CONSOLIDATED |
| | : | |
| v. | : | |
| | : | |
| Cromwell Township, Huntingdon County, PA and the Southern Huntingdon County School District | : | |
| | : | |
| Appeal of: Southern Huntingdon County School District | : | No. 940 C.D. 2022 |
| | : | |
| Orbisonia-Rockhill Joint Municipal Authority | : | |
| | : | |
| v. | : | |
| | : | |
| Cromwell Township, Huntingdon County, PA and the Southern Huntingdon County School District | : | |
| | : | No. 978 C.D. 2022 |
| Appeal of: Cromwell Township | : | Argued: December 4, 2023 |

BEFORE:  HONORABLE ANNE E. COVEY, Judge
HONORABLE STACY WALLACE, Judge
HONORABLE MARY HANNAH LEAVITT, Senior Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION BY
JUDGE COVEY                                              FILED:  January 5, 2024


Southern Huntingdon County School District (School District) and Cromwell Township (Township), Huntingdon County (County) (collectively, Appellants), appeal from the County Common Pleas Court's (trial court) August 15, 2022 order granting Orbisonia-Rockhill Joint Municipal Authority's (Authority) Petition for Preliminary Injunction (Petition), thereby enjoining the School District and the Township from adding new connections to the Authority's wastewater

treatment system (Treatment System) pending litigation of the underlying action in the trial court. Appellants present one issue for this Court's review: whether the trial court erred by granting the Petition. Upon review, this Court affirms the trial court's order.

**Background**

On December 23, 2016, the Township and the Authority entered into a 30-year Sewage Treatment Agreement (Agreement) that authorized the Township to connect its wastewater collection system (Collection System) to the Authority's Treatment System, subject to certain conditions.

Specifically, Section 1.03 of the Agreement provided, in relevant part:

> [The Township] shall have the right to deliver to the [Authority f]acilities all wastewater originating within the Pogue, Pine Tree Village[,] and Southern Huntingdon High School[/Middle School (High School/Middle School)[1]] service area described in the present Act 537 Plan [Update] for [the Pogue and Pine Tree Village areas of [the Township (Act 537 Plan)],[2] it being understood and agreed that this Agreement is not intended to address treatment of sewage from any on-lot septic systems or from other areas of the Township not presently included in the Pogue, Pine Tree Village[,] and [High School/Middle School] service area. Moreover, the [Township's] service area shall not include two recent connections to [the Township's] Collection System, said properties located in Rockhill Borough. Those

---

[1] When the parties executed the Agreement, the Middle School was attached to the High School as one building.

[2] An Act 537 Plan is a planning document approved by the Pennsylvania Department of Environmental Protection pursuant to the Pennsylvania Sewage Facilities Act, Act of January 24, 1966, P.L. (1965) 1535, *as amended,* 35 P.S. §§ 750.1-750.20a, "used to plan for long-term sewage disposal needs in townships, boroughs, etc.]" Reproduced Record (R.R.) at 377a. The Township's November 2011 Act 537 Plan, prepared by Stiffler McGraw & Associates, was in effect when the Township and the Authority signed the Agreement in 2016. *See* Stipulated Facts ¶ 5 (R.R. at 118a); *see also* Stipulated Facts Ex. C (R.R. at 135a-213a); R.R. at 378a.

2

connections shall be considered to be in the [Authority's] service area.

Agreement § 1.03 (Reproduced Record (R.R.) at 124a).

Section 1.05 of the Agreement specifies, in pertinent part:

It is agreed that **any sewer project contemplated by** [**the Township**] **other than the existing sewer service area of** Pogue, Pine Tree Village[,] and **the** [**High School/Middle School**] **shall not be addressed by the terms of this Agreement**. Any further [Township] sewer expansion project, if connection to the [Authority's Treatment S]ystem is contemplated, shall require a new agreement between the parties.

Agreement § 1.05 (R.R. at 125a) (emphasis added).

Section 4.04 of the Agreement further declares, in relevant part:

[The Township] shall pay to [the Authority] a monthly sum of two thousand dollars ($2,000.00) for the treatment of [the Township's] wastewater flow. This amount shall be and is intended to include the cost of treatment for a maximum average daily flow of twenty-six thousand (26,000) gallons, based on a rate of $2.35 per thousand gallons of flow. The monthly sum shall be paid without deduction of any expenses, costs, engineering fees, payroll or other such expenses of [the Township] in connection with the maintenance, repair, construction and performance of [the Township's] [C]ollection [S]ystem.

If [the Township's] wastewater flow increases to more than an average of twenty-eight thousand five hundred (28,500) gallons per day [(GPD)] of wastewater flow for at least two successive quarters, [the Authority] shall have the right to request that [the Township] meet within thirty (30) days of the notice of the request to consider and negotiate an addendum to this Agreement to increase the monthly treatment fee. Failing to agree on an addendum, either party may submit the claim in accordance with Section 7.02 [of the Agreement] [(relating to optional mediation)].

Agreement § 4.04 (R.R. at 127a).

Pursuant to the Agreement, the Township's Collection System collects/conveys sewage originating in the Township to the Authority's Treatment System. As the initial user base on which the Authority calculated sewer tapping fees and determined whether the Authority's Treatment System could handle additional flows, Section 3.1 of the Act 537 Plan incorporated into the Agreement the allotted 80 residential equivalent dwelling units (EDUs), plus 16.5 EDUs for the School District's High School/Middle School building located at 10339 Pogue Road (Parcel), for a total of 96.5 EDUs.[3] *See* R.R. at 125a, 139a, 267a-268a, 282a-283a, 296a, 308a-309a.

As part of the School District's previous High School/Middle School expansion project, the Pennsylvania Department of Environmental Protection (DEP) approved the School District's Sewage Facilities Planning Module, which set the maximum sewage from the Parcel to be treated at the Authority's Treatment System at 6,956 GPD.[4] *See* R.R. at 229a. However, the Authority's flow meter measures *all* flows from the Township's Collection System to the Authority's Treatment System, and does not distinguish flows coming from Pogue versus Pine Tree Village versus the High School/Middle School service areas. *See* R.R. at 333a.

Section 4.04 of the Agreement prescribes that the Township would pay for a flow meter to be installed at a location chosen by the Authority, that the Authority was solely responsible for gathering and recording data therefrom, and that the data the Authority gathered and recorded would "be used as the basis for monitoring the [Township's] flows . . . ." R.R. at 127a. According to the Authority,

---

[3] The Township also proposed to add a connection to the Authority's Treatment System from a garage located at 11089 Pogue Road. The parties agree that 4 additional residential EDUs and the garage have since been connected above and beyond the 96.5 EDUs the Authority anticipated under the Agreement.

[4] DEP issues violation notices to the Authority if/when the Township's flows exceed the Authority's approved GPD allotment. *See* R.R. at 276a-277a.

pursuant to Section 4.04 of the Agreement, the Township was supposed to install a meter specifically to measure flows from the High School/Middle School. Because the Township has not yet installed a flow meter specifically for the High School/Middle School,[5] the Township's only GPD sewage flow measures include GPD flows from the Pogue, Pine Tree Village, and High School/Middle School service areas.

In approximately 2019, the School District proposed to build a single elementary school on the Parcel that would accommodate students and staff from the School District's three existing elementary schools (Project or new elementary school).[6] The School District conducted multiple public meetings, town hall meetings, and feasibility studies related to the Project.

Because the proposed elementary school would be located on the Parcel, additional sewage planning for the Project would be required if the total

---

[5] Todd J. McCartney, the Authority's plant manager, testified:

> Q. Was it your understanding that eventually there would be a flow meter installed at the [High S]chool[/Middle School] property to tell [the Authority] what the flow would be?
>
> A. Yes.
>
> Q. Has that been done?
>
> A. Not that I know of. I have talked to the supervisor. It's supposed to be underway. I don't know if it got done.

R.R. at 333a. The Township did not offer evidence that it has installed a separate flow meter for the High School/Middle School service area.

[6] The School District's three existing elementary schools are: Rockhill Elementary School (Rockhill), Shade Gap Elementary School (Shade Gap), and Spring Farms Elementary School (Spring Farms). Only Shade Gap and Spring Farms are currently located in the Township and are included in the Township's Collection System for which the Township currently pays the Authority $2,000.00 per month for sewage treatment services. Rockhill is located in Rockhill Borough and directly pays the Authority to treat its sewage - $60.00 monthly for each of its 12 EDUs (i.e., $720.00/month). *See* R.R. at 327a-328a. When the new elementary school opens, the School District will close Rockhill, Shade Gap, and Spring Farms, and the Authority will no longer separately receive sewage flows or income from Rockhill.

sewage flow from the Parcel exceeded DEP's previous 6,956 GPD approval. *See* R.R. at 229a, 395a-397a, 403a-404a. The School District's Project engineer J. Marc Kurowski, P.E. (Kurowski), of K&W Engineers (K&W), preliminarily calculated, based on estimated flow numbers, that the Project would generate additional sewage discharge of 7,500 GPD from the Parcel. *See* R.R. at 248a. By October 8, 2019 letter, Kurowski notified the Authority that because the Project would exceed the Authority's DEP authorized sewage flow cap, the Authority had to seek DEP approval for the Authority to accept the Project's additional flows. *See id*.

However, by October 29, 2020 letter to the Township, Kurowski provided updated calculations, based on actual flow data, that the Project will only produce 2,280 GPD of additional flows to the Authority's Treatment System. *See* R.R. at 229a, 391a-393a. Kurowski represented that, based on his updated calculations,

> it appears that there will actually be excess capacity available (1,619 GPD) on [the Parcel] upon completion of the [] [P]roject and that no new sewer capacity is required at this time. As such, we respectfully request your consideration of this information and issuance of a ["]no planning["] letter to confirm this approach (which would concurrently result in a withdrawal of the previously submitted [sewage facilities planning] application for the [P]roject).

R.R.at 230a. Based upon Kurowski's updated calculations, by November 12, 2020 letter, DEP informed the Township's Board of Supervisors: "As [the Project] will not generate sewage flows that will cause the total sewage flows on th[e] [Parcel] to exceed the approved sewage flows for th[e] [Parcel (i.e., 6,956 GPD)], no sewage facilities planning is required." R.R. at 133a.

Notwithstanding, on March 16, 2021, the Authority notified the School District of its "deep concerns regarding the estimated sewage flows that will be

6

coming from [the Parcel] with the addition of the new elementary school." R.R. at 249a. The Authority expressed that the School District underestimated its flow calculations and, since the Authority had not approved and, in fact, was still working with the Township on sewage facility planning, it authorized senior environmental engineer Justin T. Matincheck, P.E. (Matincheck) from Skelly & Loy (S&L) to review the School District's flow calculations. *See* R.R. at 249a-250a. The Authority declared that extra sewage flows from the School District adding three elementary schools, plus a full kitchen,[7] would place the Township over its allotted sewage flow to the Authority's Treatment System. *See* R.R. at 250a. The Authority explained that it was seeking grants to upgrade the Treatment System to accommodate increased flows from new construction projects, but it would take at least three years or more to make the accommodations if the grants are approved. *See id.* The Authority asserted: "At this time [the Authority is] already hydraulically overloaded, and according to . . . DEP Planning Director, Tim[othy] Wagner [(Wagner)],[8] [the Authority would] not be enabled to handle any new additions until after the year 2024." *Id.*

> On May 17, 2021, Matincheck issued his report, concluding:
>
> K&W and S&L utilized different assumptions and calculation methods throughout the evaluation. To determine the existing [High School/Middle School] sewage flows[,] additional years of water usage data is required. Additionally, daily water usage records are necessary to accurately determine the peak day water usage for the [High School/Middle School]. The K&W evaluation did not consider peak day flow or

---

[7] The Authority also referenced that the new elementary school would have showers, but witnesses declared that the new elementary school would not have showers. *See* R.R. at 393a.

[8] DEP's Clean Water Program's planning section reviews construction plans for sewage flows and a receiving facility's ability to accept them. *See* R.R. at 350a.

extracurricular activities . . . .[9]  S&L has estimated the peak day flows based on the available information.

The [new elementary school] sewage flows were estimated utilized [sic] limited water usage data (only one year)[.]  [T]o complete a thorough evaluation[,] multiple years of data are required.  Additionally, like the [High School/Middle School], daily water usage records would be preferred to determine the peak day flow.  Water usage from Rockhill [Elementary School (Rockhill)] was only provided.  The water usage from Shade Gap [Elementary School] and Spring Farms [Elementary School] should also be evaluated.  The student and staff populations during the Rockhill study period (2018-2019) were not provided.  To accurately determine the water usage loading, the population breakdown during this period is required.  Additionally, the [Elementary School] staff population following the school expansion project needs to be confirmed.

The K&W evaluation utilizes the current or past student and staff populations within [its] calculations.  The future or maximum school expansion capacity should be included in the evaluation calculations.  This would include accounting for the peak day flow for the expanded school.  When reviewing peak monthly or peak day conditions, the projected sewage flows from the school expansion exceed the current sewage planning approval.

R.R. at 227a.

Clearly, the parties do not agree regarding how much additional sewage flow the Project would create, or whether the additional flows would require the parties to negotiate a new agreement.  According to the Authority, the Township was already approaching its maximum permitted flows without the Project, and if the new elementary school is connected to the Authority's system before a new agreement could be reached, the Authority would be forced to take on the additional

_____

[9] Matincheck explained that if a peak event should occur, such as a sold-out Friday night football game after a full day of school, the flows would be much higher than those calculated by the School District.

8

flows it lacked the capacity to treat. The Authority claimed that it reached out to the Township numerous times to meet and negotiate a new agreement,[10] but the Township declined to negotiate and continued to move the Project forward.[11] The Township took the position that since the Parcel on which the new elementary school is proposed to be built was part of the existing High School/Middle School service area and flows therefrom would not exceed 6,956 GPD, the Agreement covered the Project, no new agreement was necessary, and delaying Project construction was unwarranted.

---

[10] Section 1.04 of the Agreement clearly provides: "The parties each agree to the extent possible and economically practicable . . . , to cooperate and share pertinent information with each other in facilitating the maintenance . . . and/or operation of their [w]astewater collection systems . . . ." R.R. at 124a.

[11] Section 3.03 of the Agreement states, in pertinent part:

> This Agreement may be reviewed every five (5) years by the parties, upon the written request of either. During the review, the parties have the right to request changes to all requirements set forth in this Agreement[,] including but not limited to[,] the amount of the tapping fee established hereunder, the monthly treatment cost paid to [the Authority] by [the Township] and the need to collect any additional cost for treatment of excess flows as set forth in Section 4.05 [of the Agreement]. Upon a written request for review being sent, the parties shall meet within thirty (30) days of the request to consider and negotiate an addendum to this Agreement. If the parties are unable to agree, either party may submit the claim in accordance with Section 7.02 [of the Agreement (relating to optional mediation)].

R.R. at 126a. When the trial court inquired whether the parties met in 2021 to negotiate pursuant to Section 3.03 of the Agreement, the Authority's counsel represented that the parties met in January 2022 to discuss the Agreement, and "[t]hat's where it ended as far as progress . . . . [W]e have discussions then nothing gets done. Then the time gets closer and closer to the school being built. And that was the reason for the lawsuit." R.R. at 410a.

9

## Facts

On May 6, 2022, the Authority filed an Action for Declaratory Judgment (Complaint) against the Township and the School District[12] in the trial court requesting clarification of the parties' rights under the Agreement, claiming that "[t]he Township is breaching, or is threatening to imminently breach, the express terms of the Agreement by proceeding to approve the [Project] and adding additional unauthorized flows . . . to [the Authority's Treatment System]." Complaint ¶ 29 (R.R. at 10a). The Authority sought an order:

> A) Declaring that the current Agreement between the parties covers only the service areas of Pogue, Pine Tree Village[,] and the [High School/Middle School] as they existed when the Agreement was entered into in 2016;
>
> B) Declaring that any new connections or sewage expansion projects not covered under the Agreement require a new agreement between [the Authority] and the Township;
>
> C) Declaring that the Township may not approve the addition of the new elementary school without negotiating a new agreement with [the Authority]; and
>
> D) Ordering any other relief as the [trial c]ourt deems appropriate.

Complaint *Ad Damnum* Clause at 7-8 (R.R. at 10a-11a). The Township and the School District filed answers with new matter to the Complaint, and the Authority filed replies to their new matter.

Also on May 6, 2022, the Authority filed the Petition, seeking to have the trial court "enter an [o]rder preliminarily enjoining the Township from adding new unauthorized connections to [the Authority's Treatment System] during the

---

[12] The Authority acknowledged in the Complaint: "The [School] District, while not a party to the Agreement, has a direct interest in a determination by the [trial c]ourt whether the new elementary school can send its sewage flows to the [Authority's] plant. Thus, the [School] District is being joined as a party to this lawsuit." Complaint ¶ 31 (R.R. at 10a).

10

pendency of th[e] lawsuit or until further order of the [trial c]ourt." Petition *Ad Damnum* Clause at 4 (R.R. at 26a). On May 20, 2022, the School District filed an answer and brief opposing the Petition, therein asserting that the Authority failed to satisfy the criteria in *Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount*, *Inc.*, 828 A.2d 995 (Pa. 2003), for an injunction pending appeal. *See* R.R. at 46a-67a. On June 13, 2022, the Township filed an answer and brief opposing the Petition on the same basis. *See* R.R. at 87a-110a. The trial court conducted a hearing on the Petition on July 8, 2022. After the hearing, the parties filed post-hearing briefs.

On August 15, 2022, the trial court granted the Petition, thereby enjoining Appellants "from adding any new connection to the Authority's [] Treatment System pending further order of court." School Dist. Br. App. A, Trial Ct. Op. at 11 (R.R. at 474a); *see also id*. at 1-10 (R.R. at 475a-484a). The Township and the School District each appealed to this Court.[13]

## Discussion

Initially,

> [p]reliminary injunctive relief is an equitable remedy available in equity actions. *Barcia v. Fenlon*, 37 A.3d 1 . . . (Pa. Cmwlth. 2012). 'A preliminary injunction is designed to preserve the subject of the controversy in the condition in which it is when the order is made, it is not to subvert, but to maintain the existing status quo until the legality of the challenged conduct can be determined on the merits.' *Greater Nanticoke Area Educ*[.] *Ass*[*']n v. Greater Nanticoke Area Sch*[.] *Dist*[.], 938 A.2d 1177, 1183 (Pa. Cmwlth. 2007).

---

[13] The School District's appeal was docketed at Pa. Cmwlth. No. 940 C.D. 2022. The Township's appeal was docketed at Pa. Cmwlth. No. 978 C.D. 2022. By November 30, 2022 Order, this Court consolidated the appeals and named the School District and the Township as designated appellants. The Township "adopts by reference the arguments and relief requested by the School District to the extent they are consistent with [the Township's] brief." Township Br. at 11 n.1.

11

Our review of a trial court's order granting or denying preliminary injunctive relief is 'highly deferential.' *Summit Towne*, . . . 828 A.2d [at] 1000 . . . . '[**W**]**e** do not inquire into the merits of the controversy, but **only examine the record to determine if there were any apparently reasonable grounds for the action of the court below**.' *Id.* (quoting *Roberts v. B*[*d.*] *of Dir*[*s.*] *of Sch*[.] *Dist*[.], . . . 341 A.2d 475, 478 ([Pa.] 1975)). Only when it is clear no grounds exist to support the decree, or the rule of law was 'palpably erroneous or misapplied,' will such order be reversed. *Id.* [(quoting *Roberts*, 341 A.2d at 478)]; *accord Novak v. Commonwealth*, . . . 523 A.2d 318, 319 ([Pa.] 1987)). Such reasonable grounds exist when the essential prerequisites for the granting of an injunction are met. *Summit Towne*, 828 A.2d at 1000.

*SPTR, Inc. v. City of Phila.*, 150 A.3d 160, 165-66 (Pa. Cmwlth. 2016) (emphasis added).

There are six essential prerequisites a party must establish before obtaining preliminary injunctive relief:

(1) the injunction is necessary to prevent immediate and irreparable harm that cannot be compensated adequately by damages; (2) greater injury would result from refusing the injunction than from granting it, and, concomitantly, the issuance of an injunction will not substantially harm other interested parties in the proceedings; (3) the preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct; (4) the party seeking injunctive relief has a clear right to relief and is likely to prevail on the merits; (5) the injunction is reasonably suited to abate the offending activity; and[] (6) the preliminary injunction will not adversely affect the public interest.

*SEIU Healthcare P*[*a.*] *v. Commonwealth*, . . . 104 A.3d 495, 502 ([Pa.] 2014) (citing *Warehime v. Warehime*, . . . 860 A.2d 41, 46-47 ([Pa.] 2004)). Because the grant of a preliminary injunction is an extraordinary remedy, the

12

> failure to establish a single prerequisite requires the denial of the request for injunction. *Summit Towne*, 828 A.2d at 1000.

*SPTR, Inc.*, 150 A.3d at 166. The burden of proving each prerequisite rests on the moving party.[14] *Weeks v. Dep't of Hum. Servs.*, 222 A.3d 722 (Pa. 2019); *SEIU Healthcare*; *Summit Towne*.

Appellants argue that the Authority failed to establish each of the prerequisites necessary for a preliminary injunction and, thus, the trial court erred by granting the Petition.

### 1. The Party Seeking Injunctive Relief Has A Clear Right To Relief And Is Likely To Prevail On The Merits

In order to succeed on the Petition, the Authority had to show that it had a clear right to relief and is likely to prevail on the merits. *See SPTR, Inc*. Here, the merits involve the trial court's interpretation of whether the Township and the Authority must renegotiate the Agreement's terms in light of the School District's impending construction of the new elementary school that will add sewage flows to the Authority's Treatment System.

Section 1.03 of the Agreement declares, in relevant part: "[The Township] shall have the right to deliver to the [Authority f]acilities **all wastewater originating within the** Pogue, Pine Tree Village[,] and [**High School/Middle School**] **service area described in the present Act 537 Plan** . . . ." Agreement § 1.03 (R.R. at 124a) (emphasis added). Section 1.05 of the Agreement clarifies that "**the Agreement only contemplated the existing sewer service area of** Pogue, Pine Tree Village[,] and **the [High School/Middle School]** . . . [,]" and **any other sewer**

---

[14] Pennsylvania Rule of Civil Procedure 1531(a) specifies: "In determining whether a preliminary . . . injunction should be granted . . . , the court may act on the basis of the averments of the . . . [complaint] and may consider affidavits of parties or third persons or any other proof which the court may require." Pa.R.Civ.P. 1531(a).

project "**shall require a new agreement between the parties**." Agreement § 1.05 (R.R. at 125a) (emphasis added). The parties agree that the Act 537 Plan included the Parcel upon which the High School/Middle School is located and assessed the value for sewage coming from the High School/Middle School at 16.5 EDUs. The parties also agree that sewage flows from the High School/Middle School service area are currently processed at the Authority's Treatment System, and that the School District proposes to build the new elementary school on that Parcel.

However, Appellants argue that the proposed new elementary school is not a new connection outside the High School/Middle School service area contemplated by the Act 537 Plan but, rather, it will be located on the High School/Middle School Parcel, which is already connected to the Authority's Treatment System through the Township's Collection System and for which DEP has approved 6,956 GPD of total flows.

The Authority responds that it is entitled to seek a declaration of rights in anticipation of a contract breach[15] that the new elementary school's connection to the Authority's Treatment System would violate Section 1.05 of the Agreement because it was not part of the existing service area contemplated in the Act 537 Plan. The Authority further claims that, even if the Agreement is ambiguous on that point, the Authority's evidence supported that the parties never intended to include a new elementary school within the High School/Middle School service area.

At the trial court hearing, Matincheck testified that since the new elementary school would be within the High School/Middle School service area, the School District would not have to create a new connection to the Treatment System

---

[15] "[The Authority] sought a declaration under the Declaratory Judgments Act[, 42 Pa.C.S. §§ 7531-7541,] . . . [.] The longstanding rule is that declaratory judgments are not obtainable as a matter of right. Rather, whether a court should exercise jurisdiction over a declaratory judgment proceeding is a matter of sound judicial discretion." *Cutler v. Chapman*, 289 A.3d 139, 152 (Pa. Cmwlth. 2023) (citation omitted).

14

to accommodate the additional flows. *See* R.R. at 288a, 299a, 302a. He nevertheless opined that, since the Agreement contemplated only 80 residential EDUs and 16.5 EDUs for the High School/Middle School, and adding a new customer to the Township's Collection System would result in increased EDUs, the parties did not contemplate the new elementary school when they signed the Agreement.[16] *See* R.R. at 295a-297a.

Sandra Shoop (Shoop), the Authority's Board of Directors' chair, testified that she attended all of the Agreement meetings and negotiations and voted to approve it. *See* R.R. at 308a-309a. She understood that, under the Agreement, the Township was allotted 96.5 total EDUs (80 residential, and 16.5 for the High School/Middle School), and an additional agreement is necessary for any project to exceed 96.5 EDUs. *See* R.R. at 310a, 326a. Shoop recalled that the Authority attempted to stop the additional four residential EDUs the Township has since added, but ultimately decided to be a good neighbor and worked with the Township to add the connections to the Authority's Treatment System.

Shoop declared that when she voted on the 2016 Agreement, the Authority did not anticipate additional flows to the Authority's Treatment System from a new school building on the Parcel and, thus, a new agreement is necessary for the Project. *See* R.R. at 311a-312a, 315a, 327a. Shoop added that because the Township's average daily flows have increased over the previous two years, the parties need to revisit the Township's $2,000.00 monthly payment for 96.5 EDUs, especially because the Township intends to add another building. *See* R.R. at 313a-319a, 326a-327a.

---

[16] Matincheck interpreted that the reference to future customers in Section 2.01 of the Agreement meant properties within the 80 residential EDUs that had not yet been connected at that time, and adding the new elementary school would add EDUs that require a new agreement pursuant to Section 1.05 of the Agreement. *See* R.R. at 297a-300a, 305a.

15

Shoop described that because Appellants did not give the Authority full information regarding the Project, she attended school board meetings and attempted to negotiate a resolution of the issues. *See* R.R. at 311a, 321a-322a. Shoop disclosed that the Authority was willing to work with the Township to rectify all of the issues and negotiate a new agreement, and has approached the Township about doing so since 2019 or 2020, and even suggested mediation in March 2021. *See* R.R. at 315a, 319a-323a, 329a-330a. She explained that, between March 2021 (when the Authority sent the School District the letter outlining its concerns) and May 2022 (when the Authority filed the Complaint),

> [the Authority] had asked if [the Authority and the Township] could work this out a different way. If [the Township] could agree to either pay more or do something to help [the Authority]. You know, keep [the Authority] informed of what is going on. And every time [the Authority] ha[s] tried to have [the Township] come to a meeting or meet with [the Authority], . . . [the Township] did not come. And so [the Authority] just didn't know what else to do. [The Authority] saw the [new elementary] school going forward, and [was] very concerned about this extra flow of not just the regular [High School/M]iddle [S]chool, but three elementary schools going into one big elementary school. It's not just one; it's three. It's not just one school that is closing. So that's why [the Authority] went ahead and had to go this route.

R.R. at 324a-325a.

Todd J. McCartney (McCartney), the Authority's plant manager, testified that the four additional residential EDUs and a garage were connections above and beyond the 96.5 EDUs the Authority anticipated under the Agreement; however, the Authority went along with them because they were smaller connections (despite that the garage's output may impact the Authority's ability to treat the flows). *See* R.R. at 343a-344a. McCartney declared based on direct participation in

16

the consent decree process that culminated in the Agreement, that the new elementary school was not included in the Agreement. *See* R.R at 345a.

Wagner confirmed that the "prior approval that [DEP] gave the [S]chool [D]istrict for the property was for 6,956 [GPD,]" R.R. at 359a, and flow going to the Authority's Treatment System within that amount does not require sewage planning, i.e., "[a]nything that is generated [within the School District's defined property borders] would fall under the prior approval that [DEP] gave." R.R. at 359a.

Todd Banks (Banks), engineer at Stiffler McGraw & Associates, which provides services to the Township, prepared the Act 537 Plan incorporated into the Agreement. *See* R.R. at 377a-378a. Banks verified that the Act 537 Plan was based on calculated sewage flows from 80 residential EDUs and 16.5 High School/Middle School EDUs, for a total of 96.5 EDUs. *See* R.R. at 384a-385a. Banks testified that the Act 537 Plan describes the High School/Middle School service area in the narrative and depicts it in the appendices. *See* R.R. at 211a-213a, 378a. Banks declared that the new elementary school will be built just east of the High School/Middle School on the same Parcel in the High School/Middle School service area, and that the School District was fully aware of the Act 537 Plan while planning the new elementary school. *See* R.R. at 379a-380a, 385a. Banks stated that, under the Agreement, the Township's maximum average daily flow is 26,000 GPD, and that 28,500 GPD is the trigger for the parties to renegotiate the Agreement. *See* R.R. at 386a.

Kurowski, who has participated in the School District's planning for the new elementary school since approximately three and one-half years before the hearing (i.e., 2019), described that he prepared the sewage facility plan (SFP) upon which DEP would determine whether the School District had to prepare a sewer planning module related to the Project. *See* R.R. at 387a-389a. Kurowski stated

17

that, based on the up-to-date new elementary school estimated staff/student count and actual flow information (3,057 GPD per day from the High School/Middle School) in his October 29, 2020 letter to the Township,[17] DEP determined that the High School/Middle School campus's allocated capacity was 6,956 GPD. *See* R.R. at 391a-392a. Kurowski explained that he reached his 3,899 GPD capacity calculation by subtracting the High School/Middle School's then-current use (3,057 GPD) from the 6,956 GPD total capacity DEP allocated to the Parcel, which left 3,899 GPD excess capacity available on that property.[18] *See* R.R. at 393a-394a. Kurowski articulated that standard elementary school GPD use is 4.31 gallons per person, the new elementary school staff/student count was 529, and multiplied together, he arrived at the 2,280 GPD estimate for the new elementary school, which is consistent with Wagner's calculation. *See* R.R. at 395a-396a, 399a. Kurowski declared that since the 3,057 GPD from the High School/Middle School and the estimated 2,280 GPD from the new elementary school would not exceed DEP's 6,956 GPD approved sewage flows for the property, no sewage planning module was necessary. *See* R.R. at 395a-397a, 403a-404a.

Kurowski testified that he based his calculations on average daily flows, which reflect typical use on the High School/Middle School campus and, although he acknowledged that there could be peak flow days, such as when there is a football game, he did not include those in his calculations. *See* R.R. at 402a. Kurowski also agreed that flows impact inflow (i.e., inflow of rain/storm water directly into the manholes and/or Collection System pipes) and infiltration (i.e., groundwater seeping

---

[17] Kurowski clarified that the numbers in his October 8, 2019 letter were derived from estimates, while the October 29, 2020 numbers were based on actual data. *See* R.R. at 391a-393a. He explained that it is not uncommon for numbers to change as project planning progresses. *See* R.R. at 400a, 406a-407a.

[18] Kurowski did not adjust the number to account for the additional capacity the Authority would gain by Rockhill's closing. *See* R.R. at 394a.

18

into pipes and manholes) (I&I), which affects how a treatment plant operates, but stated that his review did not extend to I&I. *See* R.R. at 403a. Kurowski expressed that he was not permitted to discuss matters with the Authority for quite some time during the new elementary school planning process, but there are things the School District could do to address the Authority's issues with flows, and if he had been made aware of the Authority's difficulties, he could have addressed them. *See* R.R. at 404a-405a.

Based upon the evidence, the trial court concluded that the Authority was likely to prevail on the merits because the Project was not part of the existing High School/Middle School service area referenced in the Agreement. The trial court expounded:

> The [Agreement] between the parties requires a new agreement when there is any "further sewer expansion project." As we have observed, the Township's position is that there is no "expansion" contemplated since the new [elementary] school is within the "existing sewer service area" of the [H]igh [S]chool[/Middle School]. Initially, we thought the argument of the Township was convincing because it appeared to comport with the plain reading of at least one section of the [A]greement. After reflection, it has become apparent to us [Appellants'] interpretation is at odds with the terms of the [A]greement when the [A]greement is taken as a whole. Additionally, the Township's argument flies in the face of common sense. Followed to its logical conclusion, the Township contends that it or the [S]chool [D]istrict could construct any building it chose and of any size as long as it was within the [H]igh [S]chool[/Middle School] "service area[].["] Even then, it would not be required to revisit its sewer contract unless and until outflow exceeded 28,500 [GPD] for two successive quarters. In short, the new construction could completely overwhelm the sewerage system before the Township was required to so much as talk to the Authority.
>
> While we do not have the benefit of a complete understanding of the background of the [A]greement and

19

while there may be additional testimony which will be proffered during our declaratory judgement hearing, based on the evidence thus far adduced, we are satisfied for now that the new elementary school is not and never was intended to be part of the Agreement between the parties. . . . Representatives of the [Authority] have testified as much. More importantly, at the time the agreement was entered into, the High School[/Middle School] was assigned an "[EDU] of estimated flow" making it clear that there were assumptions which were made concerning flows coming from the [H]igh [S]chool[/Middle School] itself, and not from other buildings.

Trial Ct. Op. at 7-8 (R.R. at 481a-482a) (quotation marks omitted).

This Court has declared:

"To establish a clear right to relief, the party seeking an injunction need not prove the merits of the underlying claim, but **need only demonstrate that substantial legal questions must be resolved to determine the rights of the parties**." *SEIU Healthcare*, 104 A.3d at 506 . . . . "For a right to be clear, it must be more than merely viable or plausible . . . ." *Wolk v. Sch[.] Dist[.] of Lower Merion*, 228 A.3d 595, 611 (Pa. Cmwlth. [2020]) . . . . "***If the party has met the other requirements for a preliminary injunction** and the underlying cause of action raises important legal questions, the right to relief is clear*." *Lieberman Org[.] v. City of Phila[.]*, . . . 595 A.2d 638, 640 ([Pa. Cmwlth.] 1990) (emphasis added).

*Cutler v. Chapman*, 289 A.3d 139, 152 (Pa. Cmwlth. 2023) (bold emphasis added).

On review, this Court observes that the parties have conflicting interpretations of the Agreement that significantly affect their legal obligations, and their evidence appears to compare dislike things. Despite that the Authority's witnesses raised concerns about peak flow days, the Agreement consistently refers to calculations based on *average daily flows* rather than *peak flow* days. Moreover, Section 7.17 of the Agreement specifies that the "Agreement shall not be construed against [the Township]." R.R. at 131a. Notwithstanding, Section 7.19 of the

20

Agreement authorizes the Authority to seek an injunction if the Township breaches the Agreement. *See id.* Under such circumstances, the Authority has raised an important legal question. Accordingly, this Court will examine the remaining five preliminary injunction factors to determine whether the Authority is entitled to a preliminary injunction. *See SEIU Healthcare.*

### 2. Injunction Is Necessary To Prevent Immediate And Irreparable Harm That Cannot Be Compensated Adequately By Damages

In order to prevail on the Petition, the Authority had to establish that an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by money damages. *See SPTR, Inc.* The law is well established that "[i]njunctive relief will lie where there is no adequate remedy at law." *Hatfield Twp. v. Lexon Ins. Co.*, 15 A.3d 547, 552 (Pa. Cmwlth. 2011). Further, this Court has explained:

> To meet this burden, [the p]etitioner was required to present "concrete evidence" demonstrating "actual proof of irreparable harm." *Greenmoor, Inc. v. Burchick Constr*[.] *Co., Inc.*, 908 A.2d 310, 314 (Pa. Super. 2006). A claim of irreparable harm cannot be based on speculation and hypothesis, and for purposes of a preliminary injunction, the harm must be irreversible before it is deemed irreparable. *Id.* at 314; *see also Kiddo v. Am*[.] *Fed*[*'n*] *of State*[*, Cnty. & Mun. Emps., Local 2206*] (Pa. Cmwlth.[] No. 468 C.D. 2019, filed Aug[.] 3, 2020), [slip op.] at [23] (quoting *Novak v. Commonwealth*, . . . 523 A.2d 318, 320 ([Pa.] 1987) [(]stating that "the alleged harm or consequences must not be speculative in nature and [that] 'speculative considerations . . . cannot form the basis for issuing [a preliminary injunction]'").[19]

*Cutler*, 289 A.3d at 154-55.

---

[19] Unreported decisions of this Court issued after January 15, 2008, may be cited as persuasive authority pursuant to Section 414(a) of this Court's Internal Operating Procedures. 210 Pa. Code § 69.414(a).

21

Here, Appellants assert that the Authority failed to provide actual proof of immediate and irreparable harm, let alone harm that could not be compensated by damages. They point out that the Authority failed to provide evidence that connecting the new elementary school will exceed the maximum GPD in the Agreement. In addition, Appellants claim that the Authority's data for the second, third, and fourth quarters of 2021, and the first and second quarters of 2022, clearly establish, and the Authority acknowledged, that the Township's flows have never exceeded the 28,500 GPD limit and, thus, have not triggered Section 4.04 of the Agreement. Thus, Appellants declare that because they are compliant with the Agreement's flow limits, the Authority and the Township need not meet and renegotiate the Agreement's sewage treatment fee. Further, Appellants emphasize that the Authority's only asserted harms can be compensated by money damages, i.e., possible monetary penalties from DEP and a belief that the Township is not fairly paying the Authority.

The Authority retorts that its evidence was sufficient to persuade the trial court that immediate and irreparable harm existed to support the preliminary injunction. The Authority asserts that its flow data was not meant to prove that the Township is currently exceeding its 28,500 GPD limit, but rather to illustrate how precarious the situation is for the Authority, the Township's residents, and the surrounding public that go far beyond simple monetary damages. In particular, the Authority sets forth that the School District would proceed to build the new elementary school at great expense to its constituents, the Township would continue to add unauthorized connections to the Authority's already overloaded Treatment System, thereby jeopardizing the Authority's continued operation, and risking the health, safety, and welfare of the surrounding public, and the Authority alone would be left to face the consequences.

22

At the trial court hearing, Matincheck testified that the Authority is currently permitted to treat up to 183,000 GPD. *See* R.R. at 261a. Matincheck stated that the Act 537 Plan assumed 25,000 to 26,000 GPD from the Township's Collection System, approximately 20% of which (or 5,000 GPD) would come from the High School/Middle School. *See* R.R. at 139a, 301a-302a.

Matincheck described that the Treatment System already takes on excessive flows from the Township that create flow capacity and treatability issues. *See* R.R. at 274a. Matincheck explained that, in addition to sewage flows, I&I also come from the Collection System and make it to the Treatment System where it is treated as sewage. *See* R.R. at 274a-275a. Matincheck recalled that the Authority has experienced I&I issues since the Township began sending flows to the Treatment System; specifically, the Authority's influent flow meter reflects that the Authority already exceeds the 183,000 GPD limit "at least several days a month[.]" R.R. at 261a. Matincheck estimated that the Authority's flow meter readings reflected that the Township exceeded 26,000 GPD for the last few quarters and, on occasion, exceeded 28,000 GPD, but the Authority cannot tell what part of that the Township collects from the High School/Middle School. *See* R.R. at 303a.

Matincheck stated that the School District's engineer estimated 2,000 to 3,000 GPD of additional sewage flows from the new elementary school, which he thought was low considering there were gaps in the School District's data, the School District considered flows from only one of the three elementary schools (Rockhill, which is not currently in the Township) to be combined on the Parcel, and the School District's calculations included the summer months when school is out of session but did not account for peak flow days like when there is a football game after a full school day. *See* R.R. at 270a-273a. Matincheck stated that his estimates were 7,000 to 7,800 GPD for regular days and up to 15,000 GPD for peak flow days. *See* R.R. at 270a, 273a, 302a.

23

Matincheck disclosed that DEP may issue notices of violation that could result in corrective action plans if the Authority exceeds its 183,000 GPD limit, and that DEP has already asked the Authority to correct the Township's I&I problems. *See* R.R. at 275a-277a. Matincheck added that, notwithstanding that the Authority does not own the Collection System and lacks the ability to make the necessary corrections, DEP would cite and fine the Authority rather than the Township for the excessive flows. *See* R.R. at 277a-278a. When asked what the Authority's next steps would be if it receives flows in excess of 183,000 GPD on a continuous basis, Matincheck stated that the Authority would potentially have to modify or upgrade/expand the Treatment System (last done in 2009), and possibly require clarification and equalization tanks - paid for by the Authority's ratepayers - but the Authority lacks the space for such expansion. *See* R.R. at 278a-279a.

Matincheck explained:

[Q.]: . . . Is it your testimony that this new [elementary school] building is going to create a flow greater than the amount authorized by the 2016 [A]greement?

[A.]: Potentially.

[Q.]: What do you mean by potentially?

[A.]: It could be not every day, but on peak events I think there is a potential. On peak school events where you have school all day then maybe a football game or extracurricular activity. I don't think that was addressed in the 2,000 to 3,000 [GPD] estimate.

R.R. at 304a. Matincheck clarified:

Q. If you're looking then at building another school, with you estimating 7,000, 8,000 [GPD] on a regular basis, would that continue then to increase the issues with the [Authority] plant treating the sewage as required by law?

A. Yes. From a peak standpoint.

24

Q. Would a regular day then not be as much of an issue as if there were a rainy day?

A. Correct. A regular event, an average event would be easier to treat and handle at the plant than a peak event.

R.R. at 275a.

Shoop confirmed Matincheck's description of the Treatment System's overflow issues when it rains and stated that DEP has tasked the Authority with resolving the Township's I&I problems, despite that the Authority has no power over the Township. *See* R.R. at 311a-312a. Shoop recalled that the Authority has nevertheless attempted to assist the Township with the I&I and some progress has been made, but more progress is needed, particularly because the new elementary school is "going to definitely be over the amount of sewage permitted for that particular [P]arcel. . . . [The Authority] can't handle it." R.R. at 312a-313a. Shoop further confirmed that the Authority's customers would have to pay for any Treatment System upgrades or improvements; however, the Authority "ha[s] no more ground available to upgrade at this point[,]" except perhaps to expand vertically which, she has been informed, is cost prohibitive. R.R. at 320a; *see also* R.R. at 313a, 320a, 330a.

Shoop clarified that additional money is only part of her concern:

The other part is . . . putting a lot more work and more flow onto [the Authority's] plant that can't possibly accept it at this time. There has to be something else that could possibly be done for that purpose. And for [the Township], in the [A]greement[,] they were to contact us and get our approval for all new advancements and anything new coming on. That was not done.

R.R. at 321a. She added that the Authority may not survive the negative impact of current and future flows. *See* R.R. at 329a.

McCartney testified that he oversees the Treatment System's daily operation and maintenance under S&L's license. *See* R.R. at 332a-333a. He stated

25

that he has monitored the Township's flows into the Authority's Treatment System on weekdays since the Collection System opened in 2016 or 2017. *See* R.R. at 333a-335a. McCartney explained that he is also responsible for handling I&I, which became an issue within the first month or so after the Township connected to the Treatment System because some of the Township's lateral pipes pulled apart. *See* R.R. at 334a-335a. McCartney described that the Authority assisted the Township in fixing its issues, but the fixes only worked for a few months. *See* R.R. at 335a-336a. He detailed that the Township's I&I is not a day-to-day problem; however, when it rains more than an inch, the Township's flows cause the Authority to exceed its daily flows, and it takes approximately three days to return to normal.[20] *See* R.R. at 336a-337a.

McCartney reported at the hearing that his calculations based on the Authority's records of the Township's average flows for 2021 were 17,922.37 GPD in the second quarter - April, May, June; 29,686.16 GPD in the third quarter - July, August, September; and 28,128.70 GPD in the fourth quarter - October, November, December. *See* R.R. at 339a. He confirmed that records of the Township's average flows for 2022 were of 39,763.75 GPD in the first quarter; and 34,914.86 GPD in the second quarter.[21] *See id*.; *see also* R.R. at 235a-236a, 368a-376a.

McCartney agreed with Shoop that there was no room to expand the Authority's Treatment System, and expanding vertically is very expensive. *See* R.R. at 340a, 347a-348a. He also confirmed that DEP has issued violation notices to the Authority for being over its permitted flows. *See* R.R. at 342a, 349a. McCartney expressed concern that the addition of the new elementary school will overflow the Authority's day-to-day operations. *See* R.R. at 341a. He expressed that the problem

---

[20] McCartney opined that a two-inch rainfall will flood the Authority's Treatment System. *See* R.R. at 341a.

[21] The Authority's counsel calculated the figures based on the Authority's information, and McCartney agreed that they appeared accurate. *See* R.R. at 337a-338a, 345a-347a, 349a-350a.

26

could be avoided with equalization tanks that send the flows to the Treatment System in small amounts on lower flow days, monitoring with School District-specific flow meters and cameras in the Township's lines to see the I&I sources. *See* R.R. at 344a-345a, 348a.

Wagner stated that the 2,300 GPD the School District estimated for the new elementary school's flows, added to the High School/Middle School's 3,000 GPD, would not exceed DEP's approved limit. *See* R.R. at 361a. Wagner confirmed, based on the information the School District provided regarding the new elementary school of 2,300 GPD in proposed new flows, that the School District did not need to provide more comprehensive sewage planning. *See* R.R. at 350a, 352a-354a, 358a.

Sarah J. Rigglesworth (Rigglesworth), water quality specialist supervisor in DEP's Clean Water Program's south central regional office that monitors the Treatment System, testified that DEP tracks, among numerous other things, the Authority's monthly reports of discharge from the Treatment System.[22] *See* R.R. at 363a. She described that the Authority is solely responsible to pay penalties for violative effluents exiting its pipes. *See* R.R. at 366a-367a. Rigglesworth confirmed that DEP has issued violation notices and assessed fines against the Authority for exceeding its authorized effluent discharge limits. *See* R.R. at 365a.

Banks declared, based on his calculations for the last three quarters of 2021 and the first two quarters of 2022, the Township's average flows did not exceed 28,500 GPD. *See* R.R. at 382a-383a. Banks specified that his calculations based on the Authority's records of the Township's flows for 2021 reflect average flows of 12,467 GPD in the second quarter, 20,599 GPD in the third quarter, and 20,043 GPD

---

[22] Rigglesworth detailed: "Typically[,] sewage treatment plants discharge into a creek. Blacklog Creek. It's sampled after all treatment. So[,] at [the Authority], there is chlorination, which would be the last treatment. [The discharge is] sampled after all treatment but before it gets to the creek." R.R. at 368a.

27

in the fourth quarter. *See* R.R. at 382a. He confirmed that records of the Township's flows for 2022 showed average flows of 26,346 GPD in the first quarter, and 24,144 GPD in the second quarter. *See id.*

Kurowski added that the School District intended to put the new elementary school project out for bid in August 2022. *See* R.R. at 398a. When asked regarding the consequences of granting the injunction, he stated:

> It delays the schedule. The question is how [long] the delay is. School projects are geared towards completing construction prior to school occupancy in the fall. So[,] with an estimated two-year construction period, if we were going to start this fall, we would be trying to be in by the fall of 2024. If we miss that window, then the only option for the school is the school is completed in October of [20]24. That doesn't help anybody. We are not going to move in the middle of the year. Potentially you could move over Christmas break. Not desirable. That is incredibly disruptive for students and staff. Really what you're talking about is if you miss that window, it's going to cost us a year. That means a whole lot of things in terms of cost; not to mention just, you know, ongoing maintenance issues that have to be dealt with in facilities we are trying to replace.

R.R. at 399a.

Following the hearing, in its post-hearing brief, the Authority revised its data of the Township's flows, which showed that the Township's average flows for 2021 were 12,467 GPD in the second quarter, 20,599 GPD in the third quarter, and 20,043 GPD in the fourth quarter. *See* R.R. at 251a, 442a. The Authority's amended exhibit further reflected the Township average flows for 2022 were 26,346 GPD in the first quarter and 24,144 GPD in the second quarter. *See id.* The Authority conceded in its post-hearing brief that "these amounts have not yet reached the 28,500 daily gallon threshold[.]" R.R. at 442a.

28

The trial court concluded that the injunction was necessary to prevent immediate and irreparable harm that could not be adequately compensated by damages, because simply charging the Township additional fees for additional flows from the new elementary school was neither a full nor complete remedy where increased flows could overload the Authority's Treatment System leading to consequences and emergency upgrades that are impossible to ascertain at this point. *See* Trial Ct. Op. at 6 (R.R. at 480a).

In *Norristown Municipal Waste Authority v. West Norriton Township Municipal Authority*, 705 A.2d 509 (Pa. Cmwlth. 1998), this Court affirmed the common pleas court's grant of a preliminary injunction compelling the municipal authority and the township to continue to pay for sewage treatment services pending resolution of the parties' breach of contract, quantum meruit, and unjust enrichment disputes. This Court held that the common pleas court properly determined that the injunction was necessary to prevent immediate and irreparable harm that cannot be adequately compensated by money damages because the municipal authority was contractually bound to continue its services to the township, the flows from the township treated by the municipal authority represented a sizable portion of the municipal authority's operating budget, and the municipal authority did not have the option of discontinuing treatment services as an inducement for the township to pay the monies it owed. This Court held: "[F]ailure by [the township] to make payment would jeopardize the continued operation of the [municipal authority's] wastewater plant and pose an unacceptable threat to the health, safety and welfare of the residents of [the township]." *Id*. at 512. This Court concluded: "A civil action for money damages, which might take years to reach conclusion, would not be adequate to protect the public served by [the municipal a]uthority from the immediate threat posed by [the township's] refusal to make payments." *Id*. Although distinguishable

29

in that it was based on the township's refusal to pay fees, rather than adding flow amounts, *Norristown* is nevertheless persuasive here.

The trial court found, and the record supports, that "[t]he Township is already approaching [its] maximum permitted flows without the construction of the new elementary school." Trial Ct. Op. at 4 (R.R. at 478a). This Court's review reveals that, although not precisely quantified, the Authority produced sufficient record evidence for the trial court to determine that the Authority is bound by the Agreement to accept the Township's sewage flows from the Parcel. Although Section 4.04 of the Agreement obligates the Township to install a flow meter specifically to measure sewage flows from the High School/Middle School, because it has not done so, the parties can only estimate current flows, and are unable to more precisely estimate whether flows from the Parcel after the new elementary school is built may affect the Authority's Treatment System. *See* R.R. at 127a, 333a. Moreover, the Township has refused to meet with the Authority to discuss the Authority's concerns. If the School District proceeds to construct the new elementary school, it could end up not being able to use it. Or, if the School District proceeds to open the new elementary school, and the Township sends the additional sewage flows to the Authority's Treatment System while litigation is ongoing and I&I remains a concern, the Authority could exceed its maximum capacity, and the Authority would face a financial, environmental, and regulatory crisis that money could not adequately compensate.

Based on the foregoing, this Court agrees with the trial court that, without the injunction, the Authority, the Township, the School District, and taxpayers are likely to face irreparable harm that cannot be adequately compensated by money damages.

30

**3. Greater Injury Would Result From Refusing The Injunction Than From Granting It, And, Concomitantly, The Issuance Of An Injunction Will Not Substantially Harm Other Interested Parties In The Proceedings**; **and**

**4. An Injunction Will Not Adversely Affect The Public Interest**

The Authority also had to prove that greater injury would result from refusing the injunction than from granting it, the issuance of an injunction will not substantially harm other interested parties, and an injunction would not adversely affect the public interest. *See SPTR, Inc*.

Appellants assert that the injunction preventing the Township's connection of the new elementary school to the Authority's Treatment System, in essence, prevents the Project because the new elementary school "would be wholly unusable if prevented from connecting onto a sewer system." School Dist. Br. at 21. Appellants add that, beyond delaying construction and the opening of the new elementary school, the injunction has resulted in financial hardship because building material costs continue to rise, and further delay will require re-drafting specifications and updated permits resulting in increased expense to taxpayers. The School District further claims that the injunction is preventing it from exercising its rights under the Public School Code of 1949 (School Code),[23] under which the General Assembly authorized the School District to establish and maintain suitable school facilities and grounds.

The Authority contends that greater injury would result to it and the taxpayers than to Appellants if the injunction is denied because the Township will be permitted to connect the new elementary school to the Authority's Treatment System before the parties' rights under the Agreement are decided, which would harm the School District, the Authority, and the general public. In addition, the

---

[23] Act of March 10, 1929, P.L. 30, *as amended*, 24 P.S. §§ 1-101 - 27-2702.

Authority asserts that even with the injunction in place, the School District could proceed with construction and the Township will simply have to wait for the trial court's decision in the underlying declaratory judgment action before connecting flows from the new elementary school to the Authority's Treatment System.

The trial court addressed the relative harms and public interest injunction prerequisites together. It reasoned:

> While we agree that [barring the Township's sewer connection would not delay construction], it is difficult to imagine that the School District will or can commence construction without a guarantee of an approved sewer connection. . . . While it may delay school construction[, granting the preliminary injunction] avoids a very real and far more serious outcome; namely, the construction of a building which becomes unusable.
>
> In the meantime, the Township can hardly blame the [Authority] entirely for the adverse impact an injunction may have on [the School District's] school system. The Township, oblivious to the possibility that it may have misinterpreted its rights under the 2016 [A]greement, has apparently refused all overtures for dialogue with [the Authority] during the planning process for the new elementary school. [Appellants] might have avoided the necessity of the instant proceedings by acknowledging that the position taken by [the Authority] was at least of arguable merit. Thus, in considering the public interest, we are compelled to observe that, to the extent an injunction delays a school improvement, responsibility for such delay cannot be laid exclusively at the feet of the [Authority]. In the meantime, issuance of an []injunction avoids a far greater risk to the public; specifically, the potential overloading of [the Authority's Treatment S]ystem and whatever financial, environmental, or regulatory consequences that would result.

Trial Ct. Op. at 8-9 (R.R. at 482a-483a) (quotation marks omitted).

This Court has held:

> Courts of equity . . . have the power to prevent or restrain the commission or continuance of acts contrary to law and prejudicial to the interests of the community or the rights of individuals. And equity will intervene to restrain acts of officials which are contrary to positive law or amount to bad faith or constitute a violation of public duty.

*Bruhin v. Commonwealth*, 320 A.2d 907, 910 (Pa. Cmwlth. 1974).

Here, although the Agreement specifies that it is to be construed in the Township's favor and against the Authority, the Agreement also reflects that the Township had a public duty to both install a flow meter for the High School/Middle School service area, and to meet and discuss matters that affected the Authority's Treatment System. The Township did neither. Moreover, if the trial court denied the preliminary injunction and the Township connected the new elementary school to the Authority's Treatment System pending the trial court's interpretation of the Agreement, the School District, the Authority, and the taxpayers/general public would face far greater injury than the Township, which would merely continue to pay the Authority based on the original, lower GPD calculations and, possibly, overflow the Treatment System without suffering any consequence. Finally, there is no record basis on which the trial court could conclude that the injunction has prevented the School District from exercising its rights under the School Code.

Based on the foregoing, this Court agrees with the trial court that greater injury would result from refusing the injunction than from granting it, the issuance of an injunction will not substantially harm the Township, and an injunction would not adversely affect the public interest.

33

### 5. The Injunction Will Properly Restore The Parties To Their Status As It Existed Immediately Prior To The Alleged Wrongful Conduct

The Authority also had to prove that the injunction would properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct. *See SPTR, Inc.* This Court has explained that the status quo

> is "'the last peaceable and lawful uncontested status preceding the underlying controversy.'" *Hatfield T*[*wp.*] . . . , 15 A.3d [at] 555 . . . (quoting *In Re Milton Hershey Sch*[.] *Tr*[.], 807 A.2d 324[, 333] (Pa. Cmwlth. 2002)). Stated otherwise, one purpose of a preliminary injunction is to keep the parties in the same positions they had when the case began in order to preserve the [c]ourt's ability to decide the issues before it.

*Cutler*, 289 A.3d at 154.

Appellants argue that the Agreement authorizes the Township to add new customers, and because there was no record evidence triggering modification of the Agreement (i.e., Appellants did not exceed the GPD limitations), the injunction deprived the Township of the benefits of their bargain, allowed the Authority to avoid its contractual obligations, and created a status quo that never existed. The Authority rejoins that the Township's plan to add an unauthorized connection to the Authority's Treatment System in violation of the Agreement upset the status quo, and the injunction restored the parties to the last actual, peaceable, and lawful non-contested status that preceded the controversy. The trial court agreed with the Authority that "the issuance of a preliminary injunction in this case simply maintain[ed] the status quo concerning connections to the [Authority's Treatment S]ystem." Trial Ct. Op. at 8 (R.R. at 482a).

It is clear that the parties' last peaceable and lawful, uncontested status was when the Authority accepted sewage originating from the High School/Middle School on the Parcel. The alleged wrongful conduct is the Township's proposal to

34

add the new elementary school's sewage flows to the Authority's Treatment System without first meeting to discuss and potentially amend the Agreement. The trial court's order prohibited the Township from adding flows from the new elementary school pending the trial court's interpretation of the Agreement.[24] Accordingly, this Court agrees with the trial court's conclusion that the injunction would properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct.

### 6. An Injunction Is Reasonably Suited To Abate The Offending Activity

The Authority also had to show that the injunction was reasonably suited to abate the offending activity. *See SPTR, Inc.* The law is well settled that "the court must narrowly tailor its remedy to abate the injury." *Woodward Twp. v. Zerbe*, 6 A.3d 651, 658 (Pa. Cmwlth. 2010).

Appellants contend that the injunction, in essence, halted the Project on the mere possibility that the Authority's Treatment System could overflow during peak events, when completing the Project and monitoring GPD flows from the Parcel would remove speculation and help the parties determine whether the Township will violate Section 4.04 of the Agreement. The Township further avers that the trial court's order prohibiting *any new connection* was overbroad and not narrowly tailored to address the new elementary school's connection to the Authority's Treatment System. The Authority maintains that the injunction was reasonably suited to abate the offending activity because it prevented the Township from taking any action until the trial court determines the parties' rights under the Agreement. The trial court held that "the scope of the requested injunction suitably

---

[24] Notably, the injunction does not prevent the parties from meeting in the meantime to discuss their respective positions and arriving at a mutually agreeable solution to their respective problems.

35

abate[d] any potential harm and whether to immediately commence construction [wa]s for the School District to decide." Trial Ct. Op. at 8 (R.R. at 482a).

Indeed, the trial court's order enjoined Appellants "from adding any new connection to the Authority's [] Treatment System pending further order of [the] court." Trial Ct. Op. at 11 (R.R. at 474a). Despite that this litigation is centered upon the Township adding flows from the new elementary school, in the absence of a way to measure only flows from the Parcel, and because the Authority's flow meters do not distinguish what flows are coming from the Pogue versus Pine Tree Village versus the Parcel's service areas, *see* R.R. at 333a, adding sewer connections to the Authority's Treatment System from anywhere in the Township could irreparably harm the Authority. Accordingly, this Court holds that the trial court's order was not overbroad but, rather, was reasonably suited to abate the offending activity.

## Conclusion

Because this Court agrees with the trial court's conclusion that the Authority met the essential prerequisites for the granting of an injunction, the trial court had apparently reasonable grounds to grant the Petition. *SPTR, Inc.* Accordingly, this Court affirms the trial court's order.

_____
ANNE E. COVEY, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Orbisonia-Rockhill Joint Municipal Authority | : | CASES CONSOLIDATED |
| | : | |
| | : | |
| v. | : | |
| | : | |
| Cromwell Township, Huntingdon County, PA and the Southern Huntingdon County School District | : | |
| | : | |
| Appeal of: Southern Huntingdon County School District | : | No. 940 C.D. 2022 |
| | : | |
| Orbisonia-Rockhill Joint Municipal Authority | : | |
| | : | |
| v. | : | |
| | : | |
| Cromwell Township, Huntingdon County, PA and the Southern Huntingdon County School District | : | |
| | : | No. 978 C.D. 2022 |
| Appeal of: Cromwell Township | : | |

# O R D E R

AND NOW, this 5th day of January, 2024, the Huntingdon County Common Pleas Court's August 15, 2022 order is affirmed.

_____
ANNE E. COVEY, Judge